THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellant, v.
VIRGIL BASS, Defendant-Appellee.

First District (5th Division)   No. 1—92—4338

Opinion filed January 21, 1994.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Susan Schierl, and Maureen E. McGee, Assistant State's Attorneys, of counsel), for the People.

Frederick F. Cohn, of Chicago, for appellee.

JUSTICE McNULTY delivered the opinion of the court:

After a bench trial, defendant was found guilty of first-degree murder and unlawful use of a weapon by a felon. The trial court granted defendant's motion for a new trial and post-trial motion to suppress evidence on fourth amendment grounds. The State appealed and this court vacated the suppression order and remanded the cause to the trial court for specific findings on the issue of whether defendant was handcuffed to the wall when he was brought to the station. At the remand hearing, the trial court held that it could not determine whether defendant was handcuffed, but reinstated the order of suppression. It is from this order that the State appeals.

Prior to trial, a hearing was held on defendant's motion to suppress his statement on fifth amendment grounds. Chicago police detective Gerald McGovern testified that while investigating a mur-

der, he learned that defendant sustained a gunshot wound to his foot and had been hospitalized. The officer located defendant at his home at 8:30 a.m. on May 2, 1988, and told him that it was necessary for defendant to accompany him to the police station because he was a witness to a homicide and a victim of a shooting. Defendant accepted a ride and was a passenger in the rear seat of the police car. Defendant's foot was bandaged and he was on crutches.

Detective McGovern testified that after their arrival at the police station, defendant was not searched, fingerprinted, photographed or handcuffed. Defendant was taken to a small interview room and questioned by officers until about 9:30 a.m. Periodically throughout the day, defendant was left alone in the unguarded room with the door open. Defendant refused several offers of food. Detective McGovern admitted that defendant was never told he was free to leave. Defendant did not complain of physical discomfort, but Detective McGovern believed defendant was in pain. Detective McGovern testified that defendant used the telephone to call his wife, who came to the station and gave defendant his medication somewhere between 2:30 and 4 p.m. Defendant was advised of his *Miranda* rights at 8:30 p.m., when defendant changed his version of the shooting. The door to the interview room was then locked but defendant was not handcuffed. The officer then called for an assistant State's Attorney, who prepared a written statement which defendant signed at 2:30 a.m.

Defendant testified that when he was taken to the police station at 8:30 a.m., he was handcuffed to a ring on the wall and left in a locked room for an hour and a half. He stated that he was in pain and drowsy and although he repeatedly told the officers that he was in pain, they did not offer him any medication. According to defendant, he did not see his wife until an hour before the arrival of the assistant State's Attorney. When he saw his wife, she was crying and said she had been arrested. Defendant testified that he was never advised of his *Miranda* rights. He admitted refusing food and drink. According to defendant, the officers told him that he could not leave the room until he told them "what they wanted to hear." Defendant then gave a statement. Defendant admitted that he was not handcuffed when he met with the assistant State's Attorney and that he did not complain of his treatment to the assistant State's Attorney.

Defendant's wife, Pauline, testified that she called the police station hourly during the day, and when an officer brought her to the station at 9 p.m., he pushed her into a room, took her purse, and locked her up. She stated that she saw defendant when she was released at 4 a.m.

Assistant State's Attorney Julie Rosner testified in rebuttal that she interviewed defendant after 1 a.m., read him his *Miranda* rights and wrote down her questions and defendant's answers. Defendant read the statement and said that he understood. She asked defendant whether the police had treated him well, and he responded affirmatively.

Detective Jack Wilkins, also called as a rebuttal witness, testified that when he and Detective McGovern interviewed defendant at 8:30 p.m., defendant was not handcuffed. He stated that Detective McGovern read defendant his *Miranda* rights. Defendant was "calm and cooperative" and never complained of pain. He also stated that defendant took medication at 2 p.m. and that defendant's wife was never taken into custody.

The trial court denied defendant's original motion to suppress, noting that this motion raised only fifth amendment and not fourth amendment concerns.

At the trial which followed, Officer Dennis Zajac testified that he spoke with defendant in the Roseland Hospital emergency room. At that time, defendant informed Officer Zajac that three men shot at him and his friend Phillip Conley. Defendant told Zajac that he did not know what Conley's condition was.

Detective Wilkins was assigned to investigate a homicide at 1340 West 109th Place in Chicago and testified that he observed Conley's body at 6:30 a.m. on May 2, 1988. He also saw a trail of blood leading across the street. Wilkins further testified that he and Detective McGovern advised defendant of his *Miranda* rights at 8:30 p.m. that night, told him of the inconsistencies in his version of events and advised him that his physician had expressed the opinion that defendant's gunshot wound was consistent with being self-inflicted. In response, defendant promised to tell them the truth and stated "I'll probably do 20 years." Defendant then explained that Conley was nervous about defendant's gun because there was a "contract" on Conley for his killing of defendant's brother-in-law.

Defendant's written statement that was published to the court stated that defendant was with Conley during the evening of July 1, 1988, and both had several beers. Defendant had his wife's gun in his pocket and Conley asked to see the gun but defendant refused. When they struggled, the gun fired. Defendant wrestled the gun from Conley and fired two or three more times at Conley's upper body. As defendant was running away, he noticed that he had been shot. Because defendant was scared, he told officers at the hospital that he had been mugged.

Defendant testified at trial that he had refused to allow Conley to

see the gun, and when Conley reached for it, a struggle ensued during which defendant was shot in the foot. Defendant then shot Conley two or three times because he was afraid. Conley fell after the second or third shot, but defendant denied aiming at him. Defendant testified that he received medication an hour before giving his statement to the assistant State's Attorney and testified that he was tired and in pain, and he did not read his statement. He also admitted lying to police at the hospital because he was afraid of going to jail.

The pretrial testimony of Detective McGovern and the assistant State's Attorney was stipulated to at trial. It was also stipulated that the defendant's wife purchased a Smith and Wesson model 66 .357 Magnum pistol at a gun shop on January 22, 1988. The gun was not recovered.

The trial court found defendant guilty of first-degree murder and unlawful use of a weapon by a felon. Defendant then obtained a new attorney and filed a motion for a new trial on the grounds that the police lacked probable cause to detain or arrest him and that he had received ineffective assistance of counsel. The trial court stated that it would consider defendant's fourth amendment claim and whether the failure to present it resulted in ineffective assistance of counsel.

At the hearing which followed, Officer David Dioguardi testified that he spoke with defendant in a small interview room at the police station at 8:15 a.m. Defendant was interviewed because he was a victim as well as a witness to a crime and was asked to assist police by identifying those who shot him. Dioguardi did not give defendant *Miranda* warnings, tell defendant that he could not leave, nor consider defendant to be a suspect. According to Dioguardi, the door to the interview room was left open and unlocked. Officer Dioguardi observed defendant leave the room on crutches to go to the bathroom and to another room to call his wife.

Detective McGovern testified consistently with his testimony at the previous suppression hearing.

Defendant testified that the officers went to his home and told him it was necessary for him to go to the police station. Once he arrived at the station he was put in a locked room and handcuffed to a ring in the wall. He claimed that he was accompanied to the bathroom by a police officer and no food was offered to him. After Robert Romanoff, the attorney who represented defendant at trial, testified, the trial court found that defendant had been denied effective assistance of counsel because of Romanoff's failure to raise fourth amendment grounds in the original motion to suppress. The court also found that but for counsel's error, there was a reasonable probability that the result of the proceedings would have been

different. The court granted defendant's motion for a new trial and vacated his conviction. Defendant was granted leave to file additional motions in order to resolve the fourth amendment question. The court stated that if defendant's fourth amendment claim was ultimately determined adversely to defendant, his conviction would be reinstated.

A hearing was held on the second motion to suppress, during which testimony consistent with the previous hearings was adduced. The trial court granted defendant's motion to suppress, holding that defendant had been seized without probable cause when he was taken to the police station. The court also stated that "it is absurd to believe that Bass stayed in the police facility for 12 hours, after having been shot, without any medication, with a cast on his leg, from his foot to his crotch, simply to fulfill an obligation of citizenship that could have as easily been fulfilled from the comforts of his home." The State appealed from the trial court's order granting defendant's motion to suppress.

On March 13, 1992, this court issued an order holding that defendant was not placed under arrest at his home but instead went voluntarily to the police station. This court then considered whether defendant was taken into custody when he arrived at the police station. The court vacated the order to suppress and remanded the cause to the trial court for specific findings on the issue of whether the trial court believed defendant's testimony about being handcuffed to the wall when he was brought to the station. On remand, the trial court answered the mandate as follows:

"I am unable to resolve the conflict between the testimony of the police officers and Mr. Bass. In the Court's judgment, the credibility on both sides is weak. Consequently, I find the testimony to be in equal pose [sic]. I don't know whether Bass was handcuffed. His assertion that he was [handcuffed] is as reasonable and consistent with what else was going on in that police station in connection with him as is the police's assertion that he was [not] in the handcuffs. And their assertion that he was not handcuffed does not lead to the conclusion necessarily—and this is not trying to usurp the prerogatives of the reviewing court in any way, but explain where I am coming from. Bass was in little position to flee from that police station. And the police knew it.
    ***
So, I am at the position where as far as this Court is concerned the credibility of the witnesses on this issue is an equal pose [sic]. And, so I presume that this case will have to go back to the Appellate Court in that posture without this Court making any definitive declarations about which side of the case is more credible than the other."

The trial court then reinstated the order of suppression and it is from this order that plaintiff appeals.

The sole issue here is whether the trial court properly granted defendant's motion to suppress his statement. A reviewing court may not disturb the ruling of a trial court on a motion to suppress unless the decision is against the manifest weight of the evidence. (*People v. Booker* (1991), 209 Ill. App. 3d 384, 568 N.E.2d 211.) An individual's fourth amendment rights are violated if he is seized and then questioned while in custody on less than probable cause. (*People v. Cole* (1988), 168 Ill. App. 3d 172, 522 N.E.2d 635.) The test in determining whether a seizure has occurred is whether a reasonable person would have believed that he was not free to leave. (*People v. Graham* (1991), 214 Ill. App. 3d 798, 573 N.E.2d 1346.) Courts focus on the coercive effect of police conduct as a whole, and not on each particular detail of police conduct in isolation. *People v. Stofer* (1989), 180 Ill. App. 3d 158, 534 N.E.2d 1287.

We remanded this case in order for the trial court to make a specific finding as to whether defendant was handcuffed after he arrived at the police station. On remand, after conducting a hearing on the issue of whether defendant was handcuffed, the trial court was unable to resolve the conflict between the officers' testimony that defendant had not been handcuffed and defendant's testimony that he had been handcuffed. Nonetheless, the trial court found, and we agree, that such specific finding is not essential in determining that defendant was seized when he arrived at the police station.

In reaching its decision, the court noted that it was difficult to believe that defendant, injured and in pain, would voluntarily remain at the police station for 12 hours. The court further stated:

"It is ludicrous, in my judgment, to treat a person who is cooperating with you fully and who you have no reason to believe is guilty of the crime in such a fashion. If the police were experiencing difficulty in gathering information in order to further their interrogation of Mr. Bass, and he was indeed willing and cooperating with them fully and free to leave at any time he so desired, it seemed to me that a minimum amount of respect from [*sic*] him as a citizen would have required the police to say to him, Mr. Bass, we're running into some difficulties. We are continuing desirous of your cooperation but we don't know when we're going to complete this investigation and you—if you wish, can go to your home and get off your feet and take some medication for the pain that we believe you are suffering."

We agree with the trial court that under the circumstances here, a reasonable person would believe that he was not free to leave. When

defendant arrived at the police station, he was not taken to a public waiting area, but instead was immediately taken to an interrogation room which was approximately eight feet by eight feet in size. It was not until 8:30 p.m. that defendant was considered to be a suspect in the shooting. Nonetheless, from 8:30 a.m. to 8:30 p.m., various officers came into the room to question defendant and defendant was never told he was free to leave. Although the officers left the room, and even the station, periodically to continue their investigation, defendant was never asked whether he wanted to go home during these breaks and return to the station if necessary. It is absurd to think that defendant, who had only hours before sustained a gunshot injury to his leg and was obviously in pain, would voluntarily remain at the station for 12 hours in order to speak with police, rather than seek the comforts of his own home. Certainly, a reasonable person under those circumstances would not feel that he was free to leave. See *People v. Fitzpatrick* (1982), 107 Ill. App. 3d 876, 438 N.E.2d 222; *People v. Townes* (1981), 94 Ill. App. 3d 850, 419 N.E.2d 604.

The State argues that even if defendant was seized when he arrived at the police station, the police had probable cause to arrest defendant at that time. We disagree. Probable cause exists when the totality of the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution to believe that an offense has been committed and that the person arrested has committed the offense. (*People v. Montgomery* (1986), 112 Ill. 2d 517, 494 N.E.2d 475.) Although this standard does not require the arresting officers to have in their hands evidence sufficient to convict, it does require more than mere suspicion. *People v. Moody* (1983), 94 Ill. 2d 1, 445 N.E.2d 275.

When the police took defendant to the station at 8:30 a.m., the police knew only that defendant had been with the victim at the time of the shooting, the defendant had also been shot, and defendant's injury was "consistent" with a self-inflicted wound. This information was insufficient to arrest defendant. In fact, the officers admitted that they did not consider defendant to be a suspect until 8:30 p.m. Although the subjective view of police officers is not controlling, it is a significant factor to consider.

Accordingly, for the reasons set forth above, the trial court's conclusion that defendant was seized without probable cause after he arrived at the police station was not against the manifest weight of the evidence.

Accordingly, the judgment of the circuit court is affirmed.

Affirmed.

GORDON, J., concurs.

900

JUSTICE COUSINS, specially concurring:

This is the second time that we have before us on appeal the identical issues raised in the trial court. It is now clear that it was unnecessary in the first appeal to remand the case for the sole purpose of having the trial court make specific findings on the disputed issue regarding the alleged handcuffing of the defendant while he was at the police station. Answering the mandate of this court, the trial court has now stated:

> "I am unable to resolve the conflict between the testimony of the police officers and Mr. Bass. In the Court's judgment, the credibility of both sides is weak. Consequently, I find the testimony to be in equal pose [*sic*]. I don't know whether Bass was handcuffed."

Now, having received this response from the trial court, we decide that we had a sufficient record to have initially decided the appeal. This case underscores the uselessness of remanding appeals for further preliminary procedures regarding a particular issue before we decide the appeal when the record is sufficient to support an appellate decision and there is no abridgment of rights guaranteed by either the Federal or State Constitution or a violation of procedure mandated by Illinois Supreme Court Rules.

In this case, I specially concur only because I agree with the majority that it was not against the manifest weight of the evidence on the particular facts of this case for the trial court to conclude that the defendant, having a gunshot wound to the foot, did not agree to remain at the police station for 12 hours before he made the statement.